**IN THE UNITED STATES DISTRICT COURT**
**District of Columbia**

| | |
|---|---|
| JONES DAY, | |
| Plaintiff, | Case No.  1:06CV00466 |
| v. | Judge: James Robertson |
| RICHARD M. SCRUSHY, | |
| Defendant. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF RICHARD M. SCRUSHY'S**
**MOTION TO TRANSFER DUE TO LACK OF PERSONAL JURISDICTION**
**AND LACK OF PROPER VENUE**

Defendant Richard M. Scrushy, pursuant to Fed. R. Civ. P. 12(b)(2) and (3) and 28 U.S.C. §§ 1391, 1404 and 1406, through his undersigned counsel, states the following in support of his Motion to Transfer:

**INTRODUCTION**

Richard M. Scrushy ("Scrushy") moves for an order transferring this matter to the United States District Counsel of the North District of Alabama because this Court lacks personal jurisdiction over Scrushy.  In the alternative, Scrushy requests entry of an order transferring this case to the Northern District of Alabama because venue is not proper in this district.  As set forth more fully below, Jones Day's attempt to haul Scrushy into court in the District of Columbia should not be permitted when the parties' activities relating to the negotiation, consummation and performance of the alleged contract took place in Alabama.  Scrushy strongly disputes that any monies are owed Jones Day under the alleged contract and, in fact, contends that Jones Day is wrongfully holding in excess of one million dollars ($1,000,000.00) of unearned fees properly belonging to Scrushy.

Any legal proceedings regarding the alleged contract should take place in the United States District Court for the Northern District of Alabama.

### STATEMENT OF FACTS MATERIAL TO THE
### ISSUE OF PERSONAL JURISDICTION AND VENUE

Scrushy is the former Chief Executive Officer and Chairman of the Board of Directors of HealthSouth Corp. and its predecessor company, HealthSouth Rehabilitation Corp. (collectively, "HealthSouth"). (See, Declaration of Richard M. Scrushy, Exhibit A, ¶ 5). Beginning in March, 2003, Scrushy was made aware of various legal actions (collectively, the "Legal Actions") against him including:

a. an ongoing criminal investigation by the United States Department of Justice regarding allegations of securities fraud and insider trading later resulting in an indictment unsealed in the United States District Court for the Northern District of Alabama and eventually resulting in an acquittal of all charges;

b. a civil action brought by the United States Securities and Exchange Commission in the United States District Court for the Northern District of Alabama commencing with a freezing of Scrushy's assets; and,

c. various state court actions filed against HealthSouth and Scrushy in various state courts in Alabama.

(Exhibit A, ¶ 6.)

Upon being made aware of the existence of the Legal Actions, Scrushy contacted an Alabama counsel, Donald V. Watkins, Esq. ("Watkins") to provide immediate assistance. Watkins recognized the severity of the claims being asserted against Scrushy in Alabama and immediately acted to develop a "team approach" to assist in Scrushy's

defense.  Significantly, Watkins' initial acts in developing this "team approach" were done prior to Scrushy's retention of Watkins.  (Exhibit A, ¶ 9.)

Prior to Scrushy's retaining Watkins, Watkins contacted his professional friend Jonathan Rose ("Rose") of Plaintiff, Jones Day, to assist in the mounting Alabama Legal Actions.  Watkins contacted Rose, in part, because local Alabama attorneys with SEC experience were not available to represent Scrushy.  (Exhibit A, ¶ 9.)  On April 1, 2003, Rose flew to Alabama to meet Scrushy.  (Exhibit A, ¶ 11.)

Prior to Rose entering Alabama, Scrushy had no prior relationship with Rose and had no knowledge of Rose's existence until being made so aware by Watkins.  (Exhibit A, ¶ 12.)  Scrushy first met Rose when he traveled to Alabama on April 1, 2003 and Scrushy had no conversations with Rose prior to his initial visit to Alabama.  (Exhibit A, ¶¶ 13, 14.)  All discussions regarding Rose's representation of Scrushy occurred in Alabama.  (Exhibit A, ¶¶ 14, 37.)

Upon meeting Scrushy in Alabama, Rose agreed to assist in representing Scrushy in certain aspects of the Alabama Legal Actions.  (Exhibit A, ¶ 15.)  In this effort, Rose sought, and was granted, pro hac vice admission to the United States District Court for the Northern District of Alabama.  (Exhibit A, ¶ 15.)

Watkins served as the lead counsel on Scrushy's litigation team and coordinated the efforts of the various counsel in regard to the Alabama Legal Actions.  (Exhibit A, ¶ 18.)  Counsel other than Rose which were retained to represent Scrushy included Thomas Sjoblom of the Washington D.C. office of Chadbourne & Park, LLP and H. Lewis Gillis of the Montgomery Alabama office of Thomas, Means, Gillis & Seay, P.C.  (Exhibit A, ¶ 17.)  .

Rose began representing Scrushy in the absence of any retainer agreement. (Exhibit A, ¶ 19.)  The first attempt to reduce the parties' agreement to writing was made, not by Rose or Scrushy, but by Watkins in a letter dated April 6, 2003. (See April 6, 2003 writing, Exhibit 1 to Exhibit A.)  The letter was sent from Alabama by Watkins and delivered to Scrushy in Alabama.  (Exhibit A, ¶ 19.)  The April 6, 2003 correspondence was not countersigned by either Scrushy or Rose. (Exhibit 1 to Exhibit A.)

In subsequent correspondence dated April 28, 2003, Watkins proposed additional and amended terms to cover the representation of Scrushy by Rose.  (See April 28, 2003 correspondence, Exhibit 2 to Exhibit A.)  As with the April 6, 2003 correspondence, the April 28, 2003 letter was sent from Alabama by Watkins and delivered to Scrushy in Alabama.  Scrushy counter-signed the April 28, 2003 letter in Alabama. (Exhibit 2 to Exhibit A; Exhibit A, ¶ 21.)

On May 15, 2003, Watkins again addressed in writing the terms of Rose's representation of Scrushy.  (See May 15, 2003 e-mail, Exhibit 3 to Exhibit A.)  As with the April 6, 2003 and April 28, 2003 correspondence, the May 15, 2003 e-mail was sent from Alabama by Watkins and delivered to Scrushy in Alabama.  (Exhibit A, ¶ 20.)  The May 15, 2003 e-mail was not counter-signed by either Rose or Scrushy.  (Exhibit 3 to Exhibit A.)

Exhibits 1-3 of Exhibit A, all prepared by Watkins, and the negotiations between the parties that led to these documents, are at the core of the dispute between Scrushy and Jones Day.  Jones day contends that Scrushy agreed to pay it a flat fee of $5.0 million solely for the portion of Jones Day's work related to unfreezing Scrushy's assets. Scrushy, on the other hand, contends that the first $5.0 million paid to Jones Day was

merely intended to be a retainer against which Jones Day was to bill hourly for its time. These different interpretations are critical because there is no dispute that the value of Jones Day's services dedicated to the unfreezing of assets, if measured in terms of hourly billings, is less than $600,000.00, i.e. no where near the $5.0 million flat fee sought by Jones Day.

Even in the absence of any retainer agreement signed by both parties—indeed, even in the absence of any written proposal by Rose—Rose returned to Alabama on April 8, 2003 to continue his efforts on Scrushy's behalf.  (Exhibit A, ¶ 23.)  The first hearing in regard to the Legal Actions—the first day of the protracted asset freeze proceeding—began on April 9, 2003.  (Exhibit A, ¶ 23.)

The asset freeze proceeding lasted for eleven (11) court days and concluded on April 25, 2003.  (Exhibit A, ¶ 24.)  Rose was present in Alabama during all stages of this proceeding.  (Exhibit A, ¶ 24.)  On May 7, 2003, the United States District Court for the Northern District of Alabama unfroze Scrushy's assets. (Exhibit A, ¶ 26.)

Upon the unfreezing of Scrushy's assets, Scrushy was able to provide an initial retainer of $5.0 million to Jones Day.  Immediately upon receipt of these monies, Jones Day took a more active role in seeking to prevent the issuance of a criminal indictment in the United States District Court for the Northern District of Alabama as well as the related representation in regard to a document request issued to Scrushy by the House of Representatives' Commerce Committee in its investigation of HealthSouth.  (Exhibit A, ¶ 27.)

In an effort to prevent the issuance of a criminal indictment, Jones Day rented office space in Birmingham to house and support its attorneys and the other out-of-town

lawyers and experts working on the Alabama Legal Actions.  (Exhibit A, ¶ 28.)

Additionally, Jones Day and other professionals working on Scrushy's behalf also

worked out of a "war-room" set up in the carriage house on Scrushy's Alabama property.

(Exhibit A, ¶ 29.)

Thousands of hours were expended in Alabama by attorneys, forensic accountants

and other experts retained by Scrushy to represent him in the Alabama Legal Actions.

(Exhibit A, ¶ 30.)  During the five (5) months subsequent to Rose's retention in Alabama,

Scrushy—for the first time in connection with the Alabama Legal Actions—traveled to

Washington, D.C.  Scrushy's travel to the District of Columbia was necessitated because

of the House Commerce Committee investigation of HealthSouth.  (Exhibit A, ¶ 31.)

Scrushy would not have traveled to the District of Columbia but for the

requirements of the House Commerce Committee.  (Exhibit A, ¶ 32.)

On November 4, 2003, and despite the efforts of Jones Day in Alabama, the

United States District Court for the Northern District of Alabama caused the unsealing of

a criminal indictment naming Scrushy.  (Exhibit A, ¶ 33.)  On that same day, Scrushy

reassigned the leadership role in the Alabama criminal matter from Rose and Jones Day

to Chadbourne & Park, LLP.  (Exhibit A, ¶ 34.)

During the course of Jones Day's representation of Scrushy, virtually all of Jones

Day's actions were performed in Alabama.  (Exhibit A, ¶ 35.)  Indeed, while certain

Jones Day attorneys may be principally located in Washington, D.C., they traveled to

Alabama to perform nearly each and every one of their substantive actions.  (Exhibit A, ¶

36.)  All fee retainer agreements were negotiated and consummated in Alabama.  (Exhibit

A, ¶ 37.)

**ARGUMENT**

I.    **STANDARD FOR ANALYZING CHALLENGES TO PERSONAL JURISDICTION AND VENUE UNDER FED. R. CIV. P. 12(b)(2) AND (3).**

A.    **JURISDICTION**

Resolution of personal jurisdiction challenges normally involve a two-step inquiry: first, the court must determine whether the forum state's long-arm statute authorizes personal jurisdiction over the defendant; and, second, the court must determine whether the personal jurisdiction so authorized is consistent with due process. *International Shoe Co. v. Washington*, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945). However, the legislative history of the District of Columbia "long arm statute," D.C. Code § 13-423, as well as decisions by the Maryland and Virginia courts construing their comparable statutory provisions, compels the conclusion that the "transacting any business" provision of the District of Columbia statute is coextensive with the due process clause. *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. App. 1980). Consequently, the court's inquiry need not be bifurcated as the constitutional and statutory provisions are coextensive.  Id.

A plaintiff has the burden of establishing personal jurisdiction over the defendant. *Diamond Chem. Co. v. AtoFina Chems. Inc.* 268 F. Supp. 2d l, 5, 2003 U.S. Dist. LEXIS 10549 (D.D.C. 2003)(plaintiff must make a prima facie showing of pertinent jurisdictional facts).  In considering a motion to dismiss for lack of personal jurisdiction, a court may rely upon affidavits to establish jurisdictional facts. *Lynn v. Cohen*, 359 F.Supp. 565, 566 (S.D.N.Y. 1973).  When reliance is upon long-arm jurisdiction, the claim for relief must arise from acts enumerated within the statute.  *Charles F. Willis, Jr. v. Elizabeth Firestone Willis*, 211 U.S. App. D.C. 103, 655 F.2d 1333, 1336  (1981).

The long-arm statute does not confer jurisdiction for claims unrelated to the acts forming the basis for jurisdiction. *Id*.; *Berywn Fuel, Inc. v. Hogan*, 399 A.2d. 79, 80 (D.C. 1979) (per curium); *Cohnane v. Arpeja-California, Inc.*, 385 A.2d. 153, 159 (D.C.), cert denied, 439 U.S. 980, 99 S. Ct. 567, 58 L.Ed. 2d. 651 (1978). A District Court may exercise jurisdiction under the long-arm statute only if there are "minimum contacts between the defendant and the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Tara Ann Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 325 U.S. App. D.C. 117, 115 F.3d 1020, 1031 (1997), quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. St. 154 (1945).

### B.    VENUE

Pursuant to 28 U.S.C. § 1391, a civil action founded only on diversity of citizenship may be brought "only in (1) a judicial district where any defendant resides, if all defendants reside in the same state, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated..." Under 28 U.S.C. § 1406(a), the district court may dismiss, or if it be in the interest of justice, transfer a case which has been filed in the wrong district. 28 U.S.C. § 1404(a) provides that even where the court has personal jurisdiction and a case has been filed in a permissible venue, the court may transfer the case to another district "for the convenience of the parties and witnesses, in the interest of justice…" In considering whether to grant a venue transfer under 28 U.S.C. § 1404 (a), courts engage in a two-part test: (1) whether the action might have been brought in the proposed transferee forum, and (2) whether transfer promotes

convenience and justice.  *Excelsior Designs, Inc. v. Sheres*, 291 F. Supp. 2d. 181, 185

(E.D. NY 2003).  Federal courts have discretion to adjudicate motions for transfer

according to individualized, case-by-case consideration of convenience and fairness.

*Maloon v. Schwartz,* 399 F. Supp. 2d 2209 (D.C. Hawaii 2005).  The discretion the court

may exercise under 28 U.S.C. § 1404(a) is broad but not untrammeled.  *Fine v. McGuire*,

139 U.S. App. D.C. 341, 433 F. 2d 499, 501 (1970).

## II.    THE DISTRICT OF COLUMBIA'S LONG-ARM STATUTE DOES NOT CONFER JURISDICTION OVER JONES DAY'S CLAIM AGAINST SCRUSHY

D.C. Code § 13-423(a) provides, *inter alia,* that a District of Columbia court may

exercise personal jurisdiction over a person, who acts directly or by an agent, as to a

claim for relief arising from the person's "transacting business in the District of

Columbia."

This case involves a cause of action based in contract in which Scrushy believes it

is undisputed that  (i)  the Defendant is a resident of Alabama;  (ii)  the contract was

negotiated and executed in Alabama;  (iii)  the subject matter of the contract was located

in Alabama and the contract expressly contemplated that the services to be rendered by

Jones Day under the contract would be performed substantially in Alabama;  (iv)  the

services were in fact rendered by Jones Day in Alabama;  (v)  the person who drafted the

written documents memorializing the contract is in Alabama;  (vi)  Alabama substantive

law will be applied by the Court resolving the competing claims under the contract.

These facts resemble strikingly the facts which led the District of Columbia Court

of Appeals in *Environmental Research International, Inc. v. Lockwood Greene*

*Engineers, Inc.*, 355 A. 2d. 808 (1976) to hold that personal jurisdiction did not exist in

the District of Columbia against a non-resident who merely contracted for services to be

provided by a professional consultant residing in the District of Columbia.  In so holding,

the Court observed:

> [A] plaintiff cannot rely on its own activities, rather than those of a
> defendant, to establish the requisite minimal contacts for personal
> jurisdiction.  The mere fact that a nonresident has retained the professional
> services of a District of Columbia firm, thereby setting into motion the
> resident party's own activities within this jurisdiction, does not constitute
> an invocation by the nonresident of the benefits and protections of the
> District's laws.

*Environmental Research at 812*; *see also*, *Prousalis v. Van Krevel, et al.*, 1982 U.S. Dist.

LEXIS 10738, * 8 (1982).

Faced with seemingly insurmountable criminal and legal challenges in the

Alabama courts, Scrushy sought the assistance of Watkins, an Alabama lawyer and

businessman.  (Exhibit A, ¶ 7.)  Watkins, in turn, contacted Rose, with whom he had

prior professional association in the context of another Alabama proceeding.  (Exhibit A,

¶ 9.)

It is well established that, in order for a court to assert personal jurisdiction over a

defendant, "there must be some act by which the defendant purposefully avails itself of

the privilege of conducting activities with the forum State, thus invoking the benefits and

protection of its laws.  *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); See also,

*International Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. St. 154

(1945).  Moreover, "proper application of the minimum contacts formula requires a

consideration not only of whether a nonresident defendant has sufficient contacts with the

forum, but also of whether those contacts are voluntary and deliberate, rather than

fortuitous."  *Mouzavires supra*, *citing Developments in the Law—State-Court*

*Jurisdiction,* 7 Harv. L. Rev. 909, 928 (1960) and *World Wide Volkswagon v. Woodson,* 444 U.S. 286, 287, 295 (1980). Scrushy did not purposely attempt to avail himself of the privileges and protections of the laws of the District of Columbia. The fact that the firm contacted by Watkins to assist Scrushy in Alabama happened to be a District of Columbia firm was fortuitous, not purposeful.[1]

The instant case is distinguishable from other cases which have found that sufficient minimal contacts existed to support the exercise of personal jurisdiction in actions by District of Columbia law firms against non-residents for alleged non-payment of attorney's fees. For example, *Mouzavires, supra*, involved a case in which a District of Columbia firm was hired for its expertise in federal regulatory matters; the client expressly agreed that the law firm's services would be performed primarily in the District of Columbia; and the client contacted the law firm several times in the District of Columbia. Other cases permitting District of Columbia law firms to sue non-resident clients in the District of Columbia can be similarly distinguished. See *Law Offices of Jerris Leanard et al v. Mideast Systems, Ltd. Et al*, 630 F. Supp. 1311(D.D.C. 1986)(involving services of a government contracts expert performed in the District of Columbia); *Chase v. Pan-Pacific Broadcasting*, 617 F. Supp. 1414 (D.D.C. 1985)(hiring of law firm for its specialized expertise in FCC regulations; several trips by client to District of Columbia to meet with law firm); *Fischer v. Bander*, 519 A.2d 162 (D.C. App.

---

[1]  Scrushy's enlistment of Jones Day was done under exigent circumstances. Scrushy was faced with monumental legal challenges requiring the enlistment of enormous legal resources and funds under extraordinary time constraints. In short, Scrushy was fighting for his life. This fact must be taken into account when evaluating whether Scrushy purposely sought to "conduct business" in the District of Columbia and thereby avail himself of the protections of its laws. Conversely, Jones Day failed to take any steps which suggested a purpose or intent to avail itself of the protection of the District of Columbia courts with regard to its dealings with Scrushy. If Jones Day had wanted to limit uncertainty regarding the choice of law or forum governing any disputes with Scrushy, it simply could have had one of its several hundred lawyers produce a standard retainer letter or engagement agreement. Instead, it chose to rely on oral agreements which were eventually reflected in written documents produced by Watkins in Alabama.

1986)(client contacted law firm directly; hiring not done under duress; client came to the District of Columbia to attend several meetings and client met at law firm to execute closing documents related to radio station sale); *Hummel v. Koehler*, 458 A.2d 1187 (D.C. App. 1982)(client contacted lawyer directly; legal work performed in the District of Columbia and client traveled to District of Columbia for meetings on multiple occasions).

In contrast to these other cases, as noted above, (i)  the initial contact with Jones Day was made by Watkins (prior to his retention), not Scrushy;  (ii)  the retention of Jones Day occurred under circumstances of extreme duress;  (iii)  the contract provided for the law firm's services to be rendered in Alabama and such services were in fact rendered there under an arrangement in which Jones Day leased space in Birmingham for its use and for use by legal and other professionals not affiliated with Jones Day and in which Jones Day attorneys worked out of a special "war room" set up in a carriage house on Scrushy's property in Alabama;  (iv)  Scrushy only set foot in the District of Columbia one time, in September, 2003, in connection with a Congressional investigation.  This is simply not a situation in which the minimum requirements of the long-arm statute or the minimum due process requirements of the Constitution are met.  Therefore, this case should be transferred to the United States District Court for the Northern District of Alabama.

## III.    THE PROPER VENUE FOR ANY CLAIM AGAINST SCRUSHY IS THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA

Even assuming, *arguendo*, that this Court can exercise personal jurisdiction over Scrushy, venue is not proper in this district because the defendant does not reside in this district and a substantial part of the events or omissions did <u>not</u> take place in this district.

28 U.S.C. § 1391.  Even if this Court found that the requisite minimum contacts occurred, such minimum contacts are a far cry from supporting a finding that a "substantial part of the events or omissions" took place in this district.  To the contrary, as shown above, virtually all activity in this case took place in Alabama. Under these circumstances, venue is not proper in this district and this Court must transfer this case to the United States District Court for the Northern District of Alabama.  See *M.R. Mikkilineni v. Commonwealth of Pennsylvania*, 2003 U.S. Dist. LEXIS 13669 D.D.C.(2003) (Plaintiff's conclusory and unsubstantiated assertion that most of the omissions occurred in the district held insufficient to support a finding of substantial events or omissions in the District of Columbia); *Captain Sheriff Saudi v. Northrop Grumman Corp.*, 273 F. Supp. 2d 101 (D.D.C. 2003) (venue improper under 28 U.S.C. 1391 (a)(2) where "(speculative) facts are too far removed to allow the Court to find that a 'substantial part of the events or omissions giving rise to the claim occurred' in the District of Columbia…"); *Smith v. U.S. Investigations*, 2004 U.S. Dist. LEXIS 23504 (2004) (case dismissed under 28 U.S.C. 1391 (b)(2) where events giving rise to litigation occurred outside the District of Columbia).

Even if the Court were to conclude that venue is permissible here, the Court should exercise its discretion under 28 U.S.C.§ 1404 to transfer venue for this case to the United States District Court or the Northern District of Alabama.  Courts are guided by nine factors when determining venue under 28 U.S.C.S. § 1404: a) convenience of witnesses; b) location of relevant documents and relative ease of access to sources of proof; c) convenience of parties; d) locus of operative facts; e) availability of process to compel attendance of unwilling witnesses; f) relative means of parties; g) forum's

familiarity with governing law; h) weight accorded plaintiff's choice of forum; and i) trial efficiency. *Excelsior Designs, Inc. v. Sheres*, 291 F. Supp. 2d. 181, 185 (E.D. NY 2003). Weighing these factors leads to the inescapable conclusion that transferring the venue of this case to the Northern District of Alabama would best serve the interests of justice.

As noted above, the dispute between Jones Day and Scrushy is centered on Exhibits 1-3 of Exhibit A, all of which were prepared by Watkins. Thus, Watkins will undoubtedly be the key witness in this case. Alabama is plainly the more convenient forum for Watkins since he is an Alabama resident. More importantly, as an Alabama resident, Watkins would be beyond the power of this court to compel his attendance at trial by subpoena. While the transfer of the case to Alabama would require representatives of Jones Day to travel to Alabama, it would be less burdensome than having Watkins, a non-party, Scrushy and potentially others travel to the District of Columbia.

Further, because this case involves the interpretation of the above referenced alleged contract, the law of Alabama will be used for such interpretation, not the law of the District of Columbia. The alleged contract was negotiated, executed and performed in Alabama, and, therefore, Alabama has greater governmental interests in applying its law to the interpretation of the alleged contract and the most significant relationship to the dispute.[2]

---

[2] "Generally, in determining choice of law, the District of Columbia employs a governmental interest analysis. Under this analysis, a court first looks at each jurisdiction's policy to see what interests the policy is meant to protect, and then consider which jurisdiction's policy would be most advanced by applying the law of that jurisdiction. Part of the test of determining the jurisdiction whose policy would be most advanced is determining which jurisdiction has the most significant relationship to the dispute." *Vaughan v. Nationwide Mut. Ins. Co*., 702 A.2d 198, 203 (D.C. App. 1997). "The 'governmental interest analysis'' and the 'most significant relationship' test have sometimes been treated as separate approaches to conflict of law questions. [The District of Columbia has,] however, applied a constructive blending of the two approaches. In doing so [the District of Columbia] concurs with the observation… that 'the state with the

With regard to other relevant factors, the locus of operative facts are primarily in Alabama. The location of relevant documents is not a critical factor, since this narrow contractual dispute will not be a document intensive case and documents exist both in Alabama and the District of Columbia. Trial efficiency likewise is not a determining factor since this the court in the District of Columbia and the Northern District of Alabama should both be able to handle efficiently this narrow dispute. The fact that Jones Day chose this forum deserves some deference, but the other factors outweigh such deference and support a transfer of venue to the Northern District of Alabama.

## CONCLUSION

For the foregoing reasons, this Court lacks personal jurisdiction over Scrushy and venue is not proper in this Court.

WHEREFORE, Richard M. Scrushy respectfully requests that this Court grant his Motion to transfer this case to the United States District Court for the Northern District of Alabama and requests such further relief deemed just and proper by this Court.

---

'most significant relationship' should also be the state whose policy is advanced by application of [its] law." *Hercules & Co. v. Shama Restaurant Co.*, 566 A.2d 31, n. 18 (D.C. App. 1989). "In applying that analysis, [the District of Columbia] also consider[s] the factors enumerated in the Restatement… to assist in identifying the jurisdiction with the 'most significant relationship' to the dispute. *Id.* at 40 – 41. The Restatement provides that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties stated in Section 6… In the absence of an effective choice of law by the parties…, the contacts to be taken into account applying the principles of Section 6 to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." Restatement of the Law, Second, Conflicts of Laws, Section 188 (1971).

Respectfully submitted,

BEAN, KINNEY & KORMAN, P.C.


By:    /s/ James R. Schroll
       James R. Schroll, Esq., D.C. Bar No. 256099
       Christopher A. Glaser, Esq., D.C. Bar No. 463583
       Alan Bowden, Esq., D.C. Bar No. 465700
       2000 North 14th Street, Suite 100
       Arlington, Virginia 22201
       (703) 525-4000/(703) 525-2207 (Fax)
       *Counsel for Defendant*
       *Richard M. Scrushy*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 8, 2006, a copy of the foregoing and annexed pleading was served by electronic case filing to:


Mark W. Foster, Esq.
Thomas B. Mason, Esq.
Lisa L. Barclay, Esq.
Zuckerman Spaeder, LLP
1800 M Street, N.W.
Suite 1000
Washington, DC  20036


*/s/ James R. Schroll*

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

JONES DAY,

     Plaintiff,

v.

RICHARD M. SCRUSHY,

     Defendant.

Case No.  1:06CV00466

Judge: James Robertson

## DECLARATION OF RICHARD M. SCRUSHY

1. My name is Richard M. Scrushy, a party-defendant in the above-captioned lawsuit.

2. I am over the age of eighteen (18) and have personal knowledge of all facts set forth in this present Declaration.  All facts set forth herein are true and correct.

3. I am aware that this Declaration has been prepared and executed for use in the above-captioned litigation.

4. I am a resident of Jefferson County, Alabama and have been so at all times relevant to this action.

5. I am the former Chief Executive Officer and Chairman of the Board of Directors of HealthSouth Corp. and its predecessor company, HealthSouth Rehabilitation Corp. (collectively, "HealthSouth").

6. Beginning in March, 2003, I was made aware of various legal actions (collectively, the "Legal Actions") against me including:

    a. an ongoing criminal investigation by the United States Department of Justice regarding allegations of securities fraud and insider trading later resulting in an indictment unsealed in the United States District Court for the Northern District of Alabama and eventually resulting in an acquittal of all charges;

EXHIBIT A

-1-

b. a civil action brought by the United States Securities and Exchange Commission in the United States District Court for the Northern District of Alabama commencing with a freezing of my assets;

c. various state court actions filed against HealthSouth and me in various state courts in Alabama; and,

7. Upon being made aware of the existence of the Legal Actions, I contacted an Alabama counsel, Donald V. Watkins, Esq.

8. Recognizing the severity of the claims being asserted against me in Alabama, Mr. Watkins immediately—and prior to my retaining his services—acted to develop a "team approach" to assist in my defense.

9. Prior to my retaining Mr. Watkins, Mr. Watkins contacted his professional friend Jonathan Rose, to assist in the mounting Alabama Legal Actions. Mr. Watkins contacted Mr. Rose, in part, because local Alabama attorneys with SEC experience had been conflicted out of representing me.

10. Jonathan Rose is a partner in the Washington, DC office of Jones Day.

11. On April 1, 2003, Mr. Rose flew to Alabama to meet me.

12. I had no prior relationship with Mr. Rose and was not aware of Mr. Rose until being made so aware by Mr. Watkins.

13. I first met Mr. Rose when he traveled to Alabama to meet me.

14. I had no conversations with Mr. Rose prior to his initial visit to Alabama to meet me.

15. Upon meeting me in Alabama, Mr. Rose agreed to assist in representing me in certain aspects of the Alabama Legal Actions. In this effort, Mr. Rose sought, and was

granted, <u>pro hac vice</u> admission to the United States District Court for the Northern District of Alabama.

16.   My relationship with Mr. Rose and Jones Day was formed in Alabama as all discussions regarding Mr. Rose's representation of me occurred in Alabama.

17.   Mr. Watkins assembled additional attorneys to assist with a "team approach" he had advocated.  These attorneys included, Thomas Sjoblom of the Washington, D.C. office of Chadbourne & Parke, LLP and H. Lewis Gillis of the Montgomery Alabama office of Thomas, Means, Gillis & Seay, P.C.

18.   Mr. Watkins served as the lead counsel on my litigation team and coordinated the efforts of the various counsel in regard to the Alabama Legal Actions.

19.   During the initial week of Mr. Rose's representation, there was no effort to reduce the terms of our representation to writing.  The first such attempt was made by Mr. Watkins in a letter dated April 6, 2003 addressed to myself, Mr. Rose and others outlining the proposed terms of both Mr. Watkins' and Mr. Rose's representations. The letter was written in Alabama and delivered to me in Alabama.  A copy of the April 6, 2003 writing is attached as <u>Exhibit 1</u>.

20.   Mr. Watkins also addressed the proposed terms of representation in a letter dated April 28, 2003 and in an email message of May 15, 2003.  This letter was also written in Alabama and delivered to me in Alabama.  Copies of these documents are attached hereto as <u>Exhibits 2 and 3</u>, respectively.

21.   I counter-signed the letter dated April 28, 2003, in Alabama.  (Exhibit 2.)

22.   The parties are in dispute regarding the legal significance and proper interpretation of <u>Exhibits 1, 2, and 3</u>.

23. On April 8, 2003, Mr. Rose returned to Alabama. The first hearing in regard to the Legal Actions—the first day of the protracted asset freeze proceeding—began on April 9, 2003.

24. The asset freeze proceeding lasted for eleven (11) court days and concluded on April 25, 2003. Mr. Rose was present in Alabama during all stages of this proceeding.

25. Upon the conclusion of the SEC hearing to freeze my assets, Chadbourne & Park, LLP assumed lead responsibility for the remaining portions of the SEC enforcement case.

26. On May 7, 2003, the United States District Court for the Northern District of Alabama unfroze my assets.

27. Upon the unfreezing of my assets, Jones Day took a more active role in seeking to prevent the issuance of a criminal indictment in the United States District Court for the Northern District of Alabama as well as the related representation in regard to a document request issued to me by the House of Representatives' Commerce Committee in its investigation of HealthSouth.

28. In an effort to prevent the issuance of a criminal indictment, Jones Day rented office space in Birmingham to house and support its attorneys and the other out-of-town lawyers and experts working on the Alabama Legal Actions.

29. Jones Day and other professionals working on my behalf also worked out of a "war-room" set up in the carriage house on my property.

30. Throughout the Alabama Legal Actions, attorneys, forensic accountants and other experts retained by me through my legal team expended thousands of hours in Alabama to assist in my defense.

31.  On September 6, 2003, five (5) months after Mr. Rose first made contact with me in Alabama to assist in the defense of the Alabama Legal Actions, I traveled to Washington, D.C. for the first time in connection with the Legal Actions. This trip was in connection with the Congressional investigation.

32.  During October, 2003, Mr. Rose represented my interests before the House Commerce Committee. At no time did I voluntarily appear before the House Commerce Committee but, instead, any involvement I had with the House Commerce Committee was compelled by the United States House of Representatives.

33.  On November 4, 2003, and despite the efforts of Jones Day in Alabama, the United States District Court for the Northern District of Alabama caused the unsealing of a criminal indictment naming me.

34.  On November 4, 2003, I requested that Chadbourne & Parke LLP assume the lead role in the criminal matter. Jones Day was made aware of this reassignment on November 5, 2003.

35.  Almost all of Jones Day's representation of me in the Alabama Legal Actions and related matters, was performed in Alabama.

36.  Indeed, while certain Jones Day attorneys may be principally located in Washington, D.C., they traveled to Alabama to perform nearly each and every one of their substantive actions.

37.  All fee retainer agreements with Jones Day were negotiated in Alabama.

Further Declarant Sayeth Not.

**I declare under penalty of perjury that the foregoing is true and correct.**

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _May 5/06_

Richard M. Scrushy

# DONALD V. WATKINS, P.C.
### A PROFESSIONAL CORPORATION

2170 Highland Avenue, Suite 100
Birmingham, Alabama 35205

(205) 558-4665
Fax: (205) 558-4670

April 6, 2003

Mr. Richard M. Scrushy
2310 Marin Drive
Birmingham, AL 35243

Re:    Retainer Agreement

Dear Richard:

This letter summarizes our agreement on March 31, 2003 regarding the terms and conditions, scope of work, and fee arrangement for representing you in the following categories of litigation and other legal matters:

1. The federal criminal investigation of you and certain former HealthSouth employees, including a likely criminal prosecution on securities fraud and insider trading charges;
2. The SEC case against you and HealthSouth;
3. The federal shareholder class action and derivative lawsuits filed against you and HealthSouth in Federal Court;
4. Various state court class actions filed against you and HealthSouth; and
5. Litigation related to your insurance coverage and discharge from HealthSouth.

As you know, the most urgent legal proceedings you face at this time involve the pending SEC case in Birmingham Federal Court and the federal criminal investigation of you. In the SEC case, the government has, through an overbroad asset freeze, attempted to curtail your ability to adequately defend anticipated criminal charges we expect government prosecutors to bring against you. In short, the government wants to effectively strip you of your ability to prepare and defend against criminal charges of conspiring with other officers to manipulate HealthSouth's financial books and certain insider trading activities.

The SEC and the U.S. Attorney are working closely as a task force in a coordinated effort against you. This case will be the government's first criminal prosecution under the Sarbanes-Oxley Act. As the first major securities fraud investigation since passage of the Act, the HealthSouth matter is receiving intense high-level scrutiny within the Justice Department. There have already been eight guilty pleas taken in the

EXHIBIT 1

Mr. Scrushy
April 6, 2003
Page 2 of 8

government's criminal case. Your counsel will have to monitor the cases of each of the individual's who pleaded guilty.

The SEC case outlines the parameters of the allegations of securities fraud and insider trading that will serve as the basis for anticipated criminal charges. The shareholder class actions and derivative lawsuits, both pending and future filings, will dovetail the government's criminal and civil case against you. While we must vigorously defend the multiplicity of lawsuits against you, which are coming in almost daily, the matters that require the utmost attention and vast amount of current resources are the government's criminal and civil cases against you.

The government is using "shock and awe" tactics in this investigation. This consists of sudden raids, aggressive court maneuvers, and a full-court press on subordinate HealthSouth employees designed to net more plea agreements. The government will attack you on all fronts and in a massive fashion. It has perfected a massive "task force" assault technique that I first saw in 1989 with former Birmingham Mayor Richard Arrington, Jr. For three years, Arrington and others were bombarded with allegations of corruption, fraud, tax evasion, and conspiracy. The court maneuvers were aggressive and massive. The investigation was closely coordinated between various federal agencies.

What I learned, as lead counsel for the City of Birmingham during the Arrington investigation, was that the only effective way to defend against a massive, real-time criminal investigation and prosecution is to prepare and skillfully implement a massive, real-time defense. Every allegation of wrongdoing must be promptly responded to in the venue where it is made. This is true whether the allegation surfaces in the court of public opinion or a court of law. During the past month, the U.S. Attorney has spent a considerable amount of time trying the HealthSouth case in the court of public opinion using press conferences and media interviews to outline her case against you and others. This is particularly true when guilty pleas are announced.

I noticed that your prior legal team did not respond to the government's case against you, as outlined by the government in the court of public opinion. This failure to respond, has already seriously compromised our ability to defend this case. It has created a widespread and negative image of you. It is also allowing the general public to reach a commonly held perception that you are guilty of some sort of wrongdoing at HealthSouth. While we know this is not true, sometimes a person's perception becomes his/her reality, regardless of the facts brought out later in a trial.

In determining what we believe are fair and reasonable fees for our team to adequately represent you in this matter, we have considered the following factors:

     1.    The time and labor required;

Mr. Scrushy
April 6, 2003
Page 3 of 8

2.  The novelty and difficulty of the questions raised in the criminal and civil cases;
3.  The skill requisite to perform the legal service properly;
4.  The preclusion of other employment by the attorneys due to acceptance of this case;
5.  The customary fee;
6.  Whether the fee is fixed or contingent;
7.  The time limitations imposed by the client or the circumstances;
8.  The amount of money involved in:
    a. Fines and restitution in the criminal case, and
    b. Monetary damages in the myriad of civil cases.
9.  The experience, reputation and ability of the attorneys needed for this case;
10. The "undesirability" of the case;
11. The nature and length of the professional relationship with the client; and
12. The cost to defend in similar cases.

Based upon my prior experience in defending against federal task force investigations and prosecutions, complex shareholder class actions and derivative litigation, and insider trading lawsuits, it is our best judgments that the following amount of man-hours by our legal team must be devoted to your pending HealthSouth legal matters:

1.  The SEC investigation and lawsuit will require from 10,000 to 15,000 man-hours of attorneys' time, and at least equal amount of paralegal time;
2.  The federal criminal investigation and likely prosecution will require from 15,000 to 20,000 man-hours of attorneys' time, and at least an equal amount of paralegal time;
3.  The various class actions and derivative lawsuits will require from 5,000 to 7,000 man-hours of attorneys' time, and at least an equal amount of paralegal time;
4.  The various state class action matters will require from 2,000 to 5,000 man-hours of attorneys' time, and at least an equal amount of paralegal time; and,
5.  The litigation relating to your insurance coverage and discharge from HealthSouth will require from 1,000 to 2,000 man-hours of attorneys' time, and at least an equal amount of paralegal time.

These man-hours do not include the time necessary for forensic accounting experts who must be hired to work on this case.

Judging by the voluminous nature of the SEC investigative file we received today, federal investigators across several law enforcement agencies appear to have already spent tens of thousands of man-hours working on this case. For us to be effective in defending you, our legal team will have to at least match the time spent by federal investigators and prosecutors, and may have to spend more time than these individuals. To say that, we are playing catch up is to seriously underestimate the magnitude and severity of our tasks.

Mr. Scrushy
April 6, 2003
Page 4 of 8

The SEC lawsuit and federal criminal investigation and likely prosecution will present novel and complex legal questions because they center around the first ever prosecution under Sarbanes-Oxley. Your case is increasingly emerging as a prototype for a federal shock-and-awe strategy against corporate fraud. We will make law as we go through the SEC case and criminal prosecution.

Proper and adequate legal representation for you requires a team of skilled lawyers with subject matter expertise. Since March 31, I have attempted to assemble such a team. My experience with the Arrington case taught me that the team approach is the only effective assistance of counsel strategy to a massive government assault. In addition to myself, I have brought in H. Lewis Gillis, whose law firm, Thomas, Means, Gillis and Seay, worked with me in the Arrington case; Jonathan Rose, whose global law firm, Jones Day worked with me in the Arrington case; and Thomas Sjoblom, whose law firm, Chadbourne & Parke, is a multi-national partnership and specializes in SEC securities cases. Each of the three firms will use a limited number of additional lawyers and staff to assist them in carrying out their primary responsibilities in the case. I will serve as Chief Counsel and coordinate the litigation effort, which includes the following broad area of responsibilities:

1.  Comprehensive fact determination efforts in each of the legal proceedings, focusing first on the SEC case and federal criminal investigation and prosecution;
2.  Unfreezing your assets;
3.  Civil procedure issues;
4.  Undertaking forensic accounting activities;
5.  Legal research;
6.  Investigation of the facts, fiduciary duties and violation of law by Ernst and Young;
7.  Analyzing evidence and witnesses' statements and testimony in the federal criminal case;
8.  Handling hundreds of thousands of documents in the SEC and criminal case;
9.  Defense at hearings and trial of the SEC case;
10.  Defense at hearings and trial of the criminal case;
11.  Monitoring the proceedings related to individuals who entered guilty pleas in the criminal case;
12.  Defense representation at hearings and trial of the shareholder class action and derivative lawsuits;
13.  Defense representation at hearings and trial of the other litigation arising out of your HealthSouth employment;
14.  Research and analysis of alleged Medicare fraud;
15.  Development of petitions for interlocutory appeals and anticipated mandamus proceedings.

Mr. Scrushy
April 6, 2003
Page 5 of 8

We will make every effort to avoid the unnecessary duplication of services provided by the various law firms, and we will work hard to promote the efficient use of our time.

The swift nature of the government's real-time prosecution of the SEC and criminal cases require the members of the new defense team to literally halt their work on other matters. In my own case, I had to break away from my year-long effort to buy the Anaheim Angels Major League Baseball team and recent work on the development of a resort and casino project in the Virgin Islands. Both of these projects are viable business opportunities for me at this time and have significant ongoing development costs attached to them.

The customary fees for representation in these legal matters vary depending upon the law firm. Chadbourne & Parke requires an upfront retainer fee of $5 million for the SEC case and related criminal investigation, against which it will bill at hourly rates of $500 to $800 an hour for the work done by Tom Sjoblom and his partners. We anticipate a total of three to four lawyers from this firm working on the case.

Jones Day will be charging $500 to $800 an hour for the work done by Jonathan Rose and his partners. We anticipate three additional Jones Day lawyers working with Rose. Jones Day requires an upfront retainer fee for the SEC case and criminal investigation in the amount of $5 million, against which the hourly charges will be billed. Jones Day will work on the remaining cluster of legal matters for an additional fixed fee of $5 million which may be paid at a later date.

Thomas, Means, Gillis and Seay will be charging $300 to $500 an hour for the work done by H. Lewis Gillis and his partners. Thomas Means requires an upfront retainer fee for the SEC case and criminal investigation in the amount of $5 million, against which the hourly charges will be billed.

I need to make it clear that you will be fully responsible for the fees and costs associated with the SEC case and criminal investigation should the amount of work performed by your legal team exceeds the upfront retainer fees. Also, the ability of the law firms to obtain their respective upfront retainer fees is a fundamental and specific condition to continued representation in these legal matters.

Since I do not have an active caseload at this time because I am primarily an entrepreneur, I do not have a customary hourly rate for legal work. If I did, it would greatly exceed the rates of the attorneys listed above because I can earn more income on a per hour basis in my businesses than I can as an attorney. In light of my unique circumstances, I am requiring an upfront retainer fee of $5 million for the SEC case and criminal investigation. This is a fixed fee rate for the duration of the SEC case and related criminal investigation. I anticipate that my work on the remaining cluster of legal matters will require a similar $5 million fixed fee payment at a later date.

Mr. Scrushy
April 6, 2003
Page 6 of 8

In addition to skilled attorneys, it is essential that we hire the best forensic accounting experts available. This is a major securities fraud case growing out of allegations that a Fortune 500 company's certified financial records were fraudulent. These financial reports will have to be reviewed in detail by forensic accounting experts. Thomas Sjoblom estimates that the minimum cost for these experts and their tasks will be at least $10 million. He also estimates that it will take a staff of 20 to 25 accounting experts to work on this case. We must have the fees for these experts. The fraud allegations go to the heart of the government's case.

In determining an appropriate fee for representing you, we usually look to prevailing fees in the district where the court sits. However, this is an exceptional multi-party case involving government lawyers and others from all parts of the country. As such, we believe that a national hourly rate is appropriate for the law firms charging on an hourly basis. Additionally, local attorneys who have SEC experience are conflicted out because of the multiplicity of cases against HealthSouth and others. With respect to the criminal investigation and prosecution, very few local attorneys have faced and successfully defended against the government's shock-and-awe tactics. Typically, criminal defense firms do not have the time and resources to meet this tactic head on.

As I told you at the beginning of this letter, I expect this case to take an inordinate amount of the legal team's time, particularly during the next six to eight months. Everything the government is doing in your case indicates that it is pursuing a rush-to-judgment approach. Interestingly, the real-time prosecution strategy and rush-to-judgment approach has netted the government an unusually high number of early guilty pleas.

Based upon court filings by the government in the SEC case and criminal prosecutions, the government estimates that your exposure in its civil cases is around $725 million. We have not calculated the damage estimates sought by class action plaintiffs in the myriad of other civil lawsuits filed against you. Also, there would likely be fines and costs assessed against you in a criminal case, if the government is successful in its prosecution.

I have tried to get local counsel to join me in defending you. I approached Charlie Waldrep and Rick Kukyendall about helping us defend this case. Both are skilled lawyers who would make excellent team members. Both declined. While they did not go into detail to explain their decision to not join the team, it is my sincere belief that they declined because this case is undesirable due to the massive amount of negative media coverage over the past four weeks. In fact, since I have been on your team, I have been bombarded with negative community opinions in restaurants, office buildings, and other public places I visit on a daily basis. I do not know of any other capable and experienced local attorneys who would voluntarily subject themselves and their families to such extreme negative community perceptions of you in order to work with us on this matter.

Mr. Scrushy
April 6, 2003
Page 7 of 8

This is my first professional relationship with you as a client. The same is true for the other law firms. Due to the complex nature of the various legal proceedings and the inordinate amount of time and resources needed to effectively and adequately defend you in a proper fashion, we must be paid to continue our representation. The fact that we are facing a seasoned task force of litigators and investigators in the SEC case and related criminal investigation is a major reason for the upfront retainer fee arrangement required by your legal team. Representing you on these legal matters will essentially become a full-time job. Additionally, the Chadbourne & Parke and Jones Day firms require the upfront retainer fees because they are principally located in New York and Washington respectively.

The most similar case to yours in this district, in terms of the government's tactics and the devotion of its massive resources against an accused, was the Arrington case from 1989 -1992. The cost of defense at that time was in the neighborhood of $6 million. Arrington was successful in his defense. He did not, however, have to simultaneously defend against a companion government civil action outlining the core claims of wrongful conduct. If he had to conduct such a defense, the cost of defense would have been significantly higher.

In the highly publicized Michael Miliken securities fraud case in New York in 1989, just one of the defense firms serving as defense counsel was reportedly receiving approximately $1 million per month in fees.

Based upon all of the factors I have cited above, I am requesting on behalf of myself and the legal team acting under my direction and supervision that you pay this team on the terms and conditions outlined in this letter. At a minimum, this will require four initial retainer checks of $5 million apiece for the law firms, and $10 million allocated for forensic accounting experts. Also, you will be responsible for all other expenses and costs associated with the various cases.

We realize that your assets are frozen and that you do not have funds to make these payments until and unless your assets are unfrozen. We will wage a vigorous fight to unfreeze your assets. However, if we are not successful in this regard and payment still has not been made, then a fundamental condition for our employment will not have been met. In this event, we will have no choice but to withdraw as your counsel in the legal matters outlined in this letter.

You are entitled to have the effective assistance of counsel. The team believes that you must be comprehensive and aggressive in the presentation of your defenses to the SEC case and the criminal investigation. A token or moderate defense will put your liberty, freedom, and personal finances at severe risk.

Mr. Scrushy
April 6, 2003
Page 8 of 8

Call me if you have any questions about the terms and conditions of this retainer agreement.

Sincerely,

Donald V. Watkins

cc:   H. Lewis Gillis, Esquire
      Thomas Sjoblom, Esquire
      Jonathan Rose, Esquire

# DONALD V. WATKINS, P.C.
## A PROFESSIONAL CORPORATION

2170 Highland Avenue, Suite 100
Birmingham, Alabama 35205

(205) 558-4665
Fax: (205) 558-4670

April 28, 2003

Mr. Richard M. Scrushy
2310 Marin Drive
Birmingham, AL 35243

Re:    Addendum To April 6, 2003 Retainer Agreement

Dear Richard:

As we discussed, now that we have completed the assets freeze hearing and have a better idea of the legal challenges we face, I am writing this second letter which adds to and modifies my letter to you of April 6, 2003 (which I have attached) concerning retention of counsel.

For all of the reasons stated in that letter, we have agreed that it is imperative for you to retain the best possible legal team to defend against the many government and private actions arising from your tenure at HealthSouth that have been and will be filed against you. I have agreed to represent you in these matters and to assume litigation coordination responsibilities with respect to the entire legal team. As explained in my April 6 letter, in addition to my services, there will be three other law firms involved in this effort on your behalf: Jones Day, Chadbourne & Parke and Thomas, Means, Gillis & Seay. I will assign and coordinate the activities of the legal team on your behalf, which will include these law firms at a minimum and other experts and consultants on an as needed basis.

My responsibilities will include direction and control of your representatives in all forums related to your case-- judicial, regulatory, and legislative, as well as the public relations arena. I have stressed to you the need for unified control over all aspects of your defense to assure that all that is said and done on your behalf is fully accurate and part of an integrated strategy. I expect that I will make extensive use of Jon Rose at Jones Day to develop and implement an overall coordinated strategy. This will include the development of a strategy with respect to the recently announced House Commerce Committee investigation of HealthSouth. I understand that you agree with the need to maintain very close coordination and that you will not attempt independently to direct your representatives involved in this matter or add anyone to the team without my express approval.

WAJ-2052639v1

EXHIBIT 2

Mr. Richard M. Scrushy
April 28, 2003
Page 2

Now that the asset freeze hearing has been completed, Tom Sjoblom has agreed to assume lead responsibility for the SEC enforcement case. He and his firm Chadbourne Park will also assume responsibility for handling your defense of the securities-related derivative suits and other class action lawsuits which have been or will be filed against you.

You have agreed to make available funds needed to compensate this legal defense team. As an initial matter, you have agreed to pay to me and to each of our three law firms $5 million primarily for services to date in successfully contesting the SEC's freeze on all of your assets on an emergency and contingency basis and for Thomas, Means, Gillis, and Seay's continued assistance in all related litigations. This payment will be due at the time the asset freeze is lifted. I am attaching the wiring instructions for wiring the $5 million initial retainers to each law firm.

Given the obvious intensity and longevity of the effort required to handle this crisis situation you now face, you have agreed to compensate me, Jones Day, and Chadbourne Parke an additional $5 million each as compensation for the remainder of your defense. This second payment will be due 60 days after this letter is signed by you or 14 days after the date any criminal charges are filed against you, whichever comes first. In the case of Jones Day and Chadbourne Park, this payment will be held as a retainer against which each firm will charge its hourly fees, as noted in my April 6 letter. Any amounts that are not consumed by their hourly charges will be returned to you, and any charges in excess of the retainer will be your responsibility. As I explained in my April 6 letter, I will not be making hourly charges and will be compensated with a flat fee for the duration of the retention, which may well be several years.

As I have explained to you, given the nature of the allegations being made against you, for the moment we will defer the hiring of forensic accountants and other experts. We believe that your legal team will add the conclusive value to your defense at this stage.

We further understand that you will be employing the firm of Baise and Miller to handle any suit on your employment agreement with Health South. Their fees will be your separate responsibility.

While I understand that the costs of your defense will be great, this kind of investment is, unfortunately, required to achieve a level playing field against the arrayed power and resources of the United States Department of Justice, the Securities and Exchange Commission and the proliferation of State government and civil litigants the government has and will inspire.

If this letter accurately reflects our agreement, please sign in the space below.

WAi-2052639v1

Mr. Richard M. Scrushy
April 28, 2003
Page 3


Sincerely

Donald V. Watkins

Accepted By:

Richard M. Scrushy

4/28/03
Date

Page 1 of 1

| | |
|---|---|
| Subj: | Retainer Agreement and Invoices/Richard Scrushy |
| Date: | 5/15/2003 9:14:17 AM Pacific Daylight Time |
| From: | Donaldvwatkinspc |
| To: | klthomas@tmgpc.com, tsjoblom@chadbourne.com, jcrose@JonesDay.com |
| CC: | rscrushy@maninbham.com |

Dear Kenneth Thomas
    Tom Sjoblom; and
    Jonathan Rose:

Your law firms should have received $5 million each from Richard Scrushy by the end of the business day today. I have received bills already from Kenneth and Tom's law firms. I am reviewing them over the next few days. I made a downward adjustment to the Thomas, Means, and Gillis ("TMG") bill today. I expect some downward adjustments regarding the bills of the remaining two law firms upon completion of my review during the next couple of days.

I have also reviewed the proposed retainer agreement between TMG and Moore and Associates, LLC for $200,000. TMG is authorized to enter into this agreement on the terms and conditions specified in the draft retainer agreement.

I recognize that we had to drop everything we were doing on March 27, 2003, and come to the aid of Richard Scrushy. For five weeks we did not know what to expect from the myriad of legal problems facing Richard. The bills I have reviewed for March and April reflect duplication of services within and between law firms that is understandable and unavoidable in a crisis response situation. However, we will not tolerate and approve the unnecessary duplication of services and expenses from this point forward. Richard Scrushy prepaid a substantial portion of his legal fees and expenses. These prepaid expenses will be subjected to the highest level of scrutiny by me and Richard, across the board. Also, we will be limiting the number of lawyers and paralegals each firm has working on the various legal matters. In short, we are streamlining the manner in which our team delivers its legal services to Richard. Every prepaid dollar your firm received is sacred and will be regarded as such by me and Richard.

Any interest money earned on the prepayment of Richard's legal fees and expenses to your three firms shall accrue to the benefit and account of Richard. Also, any unused funds will be promptly refunded to Richard at the conclusion of your work on his cases. We intend to stretch these prepaid dollars as far as we can.

Do not engage any outside consultant with an aggregate compensation of $10,000 or more without my specific approval. Also, submit a copy of your monthly bills directly to me for my review and approval.

Thanks for the hard work and great attitude of this team. We have a long way to go. Let's stay focused.

Sincerely,

Donald

cc: Richard Scrushy

EXHIBIT 3